Good morning, Your Honors, and counsel. My name is Randall Acker, and I represent the Petitioner Bookstore. This case involves our – well, first of all, my clients owned the bookstore, as the district court noted, for about 30 years. During this time period, there was only a handful of fire code violations. This case came to a culmination with an inspection that was done May of 2007, this May 31, 2007, inspection. And here's where one of our first issues, with all due respect to the district court, is they labeled that as a re-inspection. Well, actually, and the re-inspection was from a November 29, 2005, inspection. In that November 2005 inspection, what was found were only two items, a burned-out light bulb on an exit sign and a certification on a fire extinguisher that had expired. So 18 months later, we have this re-inspection for these two items. Now, if you look in the record, however, it's labeled with an S, which is for – and also Alderman, Mr. Alderman, the fire inspector, he said in his deposition, also in the excerpts of record, that this was a special inspection. So our point is, this was not a re-inspection. Mr. Alderman also said that to have three people show up, two people from the Fire Bureau and one from the Bureau of Services, to show up to inspect these two items would have been excessive and was excessive. My point I'm making here is, by the time of the May 2000 inspection, the city had targeted my client's property. They had targeted it as part of their HIT team, the HIT Housing Intervention Team. Now, the city has referred to that. They don't like that because it's a little harsh-sounding. They call it the CCIT, the Code Compliance Intervention Team. Of course, they came up with that name after the situation had already ensued for quite some time. This team targets properties. And it uses its – and as Commissioner Leonard says, it is an unstoppable force. And with the power of three agencies, it can find anything. The three agencies, Fire Bureau, Police Bureau, and Housing, BDS. This case is very similar to a case, a Ninth Circuit court case, of a case that was in the Squaw Valley. And in that decision, that dealt with disposal of wastewater. And in that decision, what was important from it is what the Court found that the Petitioner or the nonmoving party did not prove. It did not show that there was any other parties that were comparable. It did not show or did not even ID any other landowners that had issues with wastewater. And the Court, for the disparate part for this Equal Protection analysis, the Court stated that the government entity here had conceded that they had treated Squaw Valley differently. That's parallel to this case. In this case, there's no question that my client was subject to different treatment than others because it was targeted by the hit squad. And how there's abundance through the record of comments from – especially as we took out excerpts from deposition transcripts, where the city has admitted that, yes, we treated them differently. A reinspection, for instance, with three inspectors, a subsequent inspection with 12. In Squaw Valley, the case where the Indian tribe or tribes were objecting to the use of this artificial – this manufactured snow out of wastewater. That's correct. They were – they were objecting in Squaw Valley to the – basically, there's an agency that makes sure that any kind of wastewater is treated. And so what Squaw Valley's point was that they were subject to a more formal regulation and procedure, just like in this case. Another parallel with this case is it was deemed a pretext situation. There was an individual that was part of the government, a Mr. Singer in the Squaw Valley court found, animosity. There was a meeting, for instance, in the Squaw Valley case where he was embarrassed. Yes. Okay. Kennedy. I just asked if that was the case. That's the one where the – where the tribes were complaining. And the point that I'm trying to make as far as the animosity, again, that parallels this case. In this case, we have an officer, Officer Myers. Officer Myers, and this is in the record, when he first met Mr. Wright, who is – or, yeah, Mr. Wright, who is one of the owners of the bookstore, it was in a bar. He says that — They had a fracas over there. We know about that. Okay. And you also are aware that he felt that there was a veiled threat on his life. And also in the record, as Mr. Wright said, one – one thing he would do is he would park his police car in front of the store for over an hour on end with lights on. Well, there was a lot of stuff going on in that place, wasn't there? There were – there was criminal activity. It's an old — Criminal activity, yeah. Yeah. There was – there was no criminal activity in Squaw Valley, was there? No, but — Yeah, but anyway, there was criminal activity. There were people shooting up drugs. There was prostitution. There was a lot of stuff going on. I think a better case, then, with regards to criminal activity, also, this circuit, would be the Armandarez case. And in that case, this circuit declared that using administrative housing code searches should not be used as an instrument for needed police action. And that's, in essence, what happened here, that our point first is there's animosity. It was personal animosity. The City's position is the reason why my client — This is the — yes. That's absolutely right. We know all about that. Yes. The housing code sweep. Absolutely. Yeah. Okay. That was — yeah, sure. All right. And there, the buildings were preselected based on criminal activity. That's right. And so similar — this case is very similar to that. And I think if you take the City's position that they went after my client because of the criminal activity in Old Town, well, again, there's a problem there. They're using housing code. They're using fire code, enhanced enforcement of such, because of criminal activity. Our point is actually it's animosity because of Mr. Meyer's animosity toward my client. Either scenario, this is improper. As I was starting to say earlier, the record is full of admissions, concessions by the City officials that my client was treated differently. There was this disparate treatment. We have from Alderman himself that, as I said before, using three people was excessive. This is page 73. We have also the admission that this inspection for these two items, and it's important that we have two buildings, to note there's two buildings. There's a Fourth Avenue building and a Burnside building. But they look like one when you get inside. Right. But the fire extinguisher certification in Lightbulb was in one section. When they did their re-inspection, they went ahead and inspected both buildings. So, again, it was excessive. It was a special inspection. We also have Bodkin, who's from the housing, in a subsequent inspection, he said that he was instructed by the Commissioner to do a complete and thorough inspection, that he had never, ever been instructed to do such before. This is the first time. He also said ---- Scaliaro, what's wrong with that? Well, what's wrong with that is, again, for the disparate treatment is my point here, is that how the housing, how they do inspections, two categories. One, if someone's seeking a permit, they'll go do an inspection. Two, if there's been a complaint filed, they'll do an inspection. Neither were the case here. Mr. Bodkin admitted when they did the inspection, I'm talking about the May inspection of 2007, as well as the November inspection, there were no open complaints. There were no housing code complaints against my client. So ---- Well, what about the turning off the power? Okay. Was that in response to a complaint, or was it a response to the inspection? It was a response to the inspection. And that was after the November inspection. And that's part of our negligence claim. And I can shine some light on that also, moving on from the equal protection. But, yes, turning off the power was after their inspection. This is the November inspection. They had 12 people show up. A surprise inspection lasted for more than two hours, went through the entire place. And subsequent to that, they decided to instruct PG to turn off the power. And the water collected on the roof and the roof collapsed. That's absolutely right, Your Honor. We had ---- there's a pump on the roof. And I think one thing that the district court noted is they tried to discard testimony from my client. And how they did that was, I think, by in essence saying it was a sham affidavit that was submitted. Well, how often does your client clear the drains from the roof, you know, you have these drains that come down? That's right. How often do they clear them? Sporadically. And actually, one of the issues, when they did their inspection, he had people that he had hired at that time who were actually going up there to clear some of the leaves out. Now, the pump that was up there was as a safety precaution. It had an automatic switch in it. And the issue here is that, no, did he manually turn on the pump as he said in his deposition? No. Was it hardwired? No. But it was plugged in. And it had an automatic switch on it. So, no, he did not have an occasion on the pump to go up there and turn it on himself. However, it had an automatic switch, as stated in his — in the record before he. He stated this, as well as Mrs. Wright. And by turning off the power, it caused the pump so it was no longer operable. There's also no dispute in the record that the pump was plugged into. Both Mr. and Linda Wright, Mr. Wright and Mrs. Wright, stated that the pump was plugged into the property, the Burnside property. And I know there is a dispute in the record over was it possible to turn off power in one or not the other. Well, the evidence in the record, they're separately metered. We appreciate that we have a city official who showed up and said, well, they're intertwined. We couldn't disentangle them. We also have conflicting evidence from my clients who have owned the property 30 years and said, no, they're separately metered. They're separate electrical. You could have shut off and know there wasn't a danger. So — Kagan. Is that one and the same, because they're separately metered? Does that tell me that there was a way to turn them off separately? That's our position. If you have separate meters for two separate buildings, you have electricity that's being monitored for two separate buildings, certainly you can turn off electricity to one and not the other. Well, you say certainly. I just couldn't find it in the record. And there was just this one expert testifying. I think he was qualified by the district court, right? So — There was — that is correct. They had an expert show up and said he couldn't. And I think his point was — Sorry. Did you say couldn't? He could not. And this was the city's expert. But his point was because it wasn't properly labeled. So he couldn't determine. This is the same expert that showed up on behalf of the city who was part of the hit squad who went in there to go ahead and do these heightened inspections. Right. I'm clear about that. What I'm trying to figure out is what other evidence did the district court have? In front of it. Right. Yeah. The other evidence would be the testimony from both — and they're not electricians. No, we did not cause — call another expert if that's the Court's question. But we did have — we do have testimony from both Mr. Wright and Mrs. Wright saying that they are separate, they can be separated, they're separately metered. Okay. So I'd like to reserve — unless there's any questions now, I'll reserve any remaining time. Okay. Thank you. We have pleased the Court, Denis Vanier, of hearing for the defendants. The district court correctly granted — granted the motion for summary judgment in this case for two main reasons. First, on their Class of 1 equal protection claim, plaintiffs did not point to any evidence that they were treated differently than others who were similarly situated in all relevant respects. And second, on their negligence — negligence claims, excuse me, plaintiffs did not point to any evidence that defendants were negligent in cutting off the electrical power to the building or that cutting off the power caused the collapse of the roof of that building six months later. And for those reasons, this Court should affirm the judgment of the district court. To sustain a Class of 1 equal protection claim, plaintiffs first had to pass a threshold. They had to show that defendants treated them differently than others who were similarly situated in all relevant respects. And that evidence simply does not exist here. Plaintiffs, if I understand their argument correctly, attempt to hang their hat on what they allege were concessions by the city in this case. You will find no trace of those concessions in the record. As the district court pointed out, the one statement on which plaintiffs focused mostly was in his deposition, Commissioner Leonard stated that, no, the CCIT did not use a set number of prior code violations in order to decide whether to inspect a property, because doing so would just lead to too many properties having to be inspected. That is not an admission of disparate treatment. And that's why this is not a case comparable to, for example, the Squaw Valley case. How did they wind up on the list? As we explained in our brief, the CCIT looks at a variety of factors, not just a number of prior code violations. And in this case, it was substantial prior code violations, a history of high level of police services in the past due to criminal and nuisance activity, suspected significant building code violations. And those are all supported  So they just had the two, right, the burned-out light bulb and the fire extinguisher violation when this all started, which didn't sound very substantial to me. So what is your response to opposing counsel's citation to authority that building codes ought not be used to investigate criminal activity? There's lots of evidence of criminal activity, but --- And I understand. So I guess I have three responses to that. First, the record is unambiguous. It's not disputed that the property was assigned to the CCIT team after the May 2007 follow-up inspection. And --- Well, I think that is disputed, but all right. That's your position. It is not factually disputed, I would say. I understand that the blue brief frames it differently, but there is no witness who ever testified, be it Officer Myers, be it Officer Alderman. In fact, I would point this Court to ER at pages 108 and 176, the deal with the assignment of the bookstore to the CCIT, and that was after the May 2007 inspection. And I would also point out that I believe it was Inspector Alderman who conducted the May 2007 inspection did not quite testify in the way that was described. I mean, he did testify. He was asked a hypothetical in his deposition -- in the deposition. He was asked, well, would you agree that if the only thing that we were re-inspecting were a burned-out light bulb, that it would be unusual to come up with three inspectors? And he said yes. But he never said -- in fact, he testified in his deposition that this was a re-inspection. But so that's the first question. But they just came with three people. They just happened to come with three people to inspect the burned-out light bulb on that fire extinguisher. Correct. And that's all we have in the record. That was not followed up on in the -- in the deposition. But going so then moving forward, so then we have the May 2007 inspection that finds 30 separate fire code violations at that point. And we contend, and the record shows, that the property was assigned to the CCIT after that point. Now, I would like to turn to the question about the criminal violations. Now, in this case, we also had suspected building code violations, other things. But in fact, this Court has never held, and no court has held, that it is irrational to assign a pro to enforce building codes specifically because of suspected criminal activity. And actually, the Armendariz case by this Court is an example of that, because what this Court said in Armendariz at 75F3rd, page 1311, this Court said that directing efforts to enforce the housing code at high-crime areas is not a criminal violation. This Court said that was not improper. The problem in Armendariz is the record showed that or at least suggested that was a pretext. So the problem was not the rationale, namely, do you enforce the housing code in high-crime areas. The problem in Armendariz was that was a pretext. That was not the valid reason. And the third part of my answer is that regardless of the reason for a particular government action, it always comes back to the fact that initial threshold of disparate treatment, is you have to show that for these reasons, your property was inspected, and that led to you being treated differently than others who were similarly situated in all relevant respects. And that's really where the district court correctly granted the motion for summary judgment in this case. Kennedy. What does a plaintiff have to show on a class-of-one's equal protection claim to succeed on that claim? What would he have had to show for that? Yeah. Well, he can – I guess this Court's recent decision in Towery is instructed on that case, because what the Court said in Towery is that when you are looking at a State action that is essentially discretionary, it involves the weighing of a lot of factors. What this Court said is you have to show a pattern of generally exercising the discretion in a particular manner while treating one individual differently and detrimentally. And so in this case, as the district court noted, the plaintiffs could have shown other properties with the same types of concerns, the fire code violations, building – suspected building code violations, criminal behavior, that were not assigned to the CCIT. There was also a suggestion that perhaps, or at least the plaintiff argued, that the reason for assigning their property to the CCIT was the nature of the business, that this was an adult business. And so plaintiffs could have shown perhaps other adult business – businesses with possible code violations that were not assigned to the CCIT. So there are several ways of meeting that standard. In fact, the existence of this Court's case law demonstrates that it is possible to reach that standard. It simply did not happen in this case. There are just no comparables at all. Moving on briefly to the court's case law, you have to show that the case such as this, does the plaintiff have to show that the – this alleged equal protection claim was – the conduct was without any rational basis? That is our position. And I did read the reply. You didn't say that, though. You didn't bring that out when I asked you the question. Oh, I – and perhaps in that case I apologize. Perhaps I misunderstood the question. So are you asking whether they also have to show a lack of rational basis for the inspections in this case? No, I'm – I asked – I was asking you what the plaintiff has to show. You're not the plaintiff. And I understand. So, correct. I guess I was focusing on the first element. So first, they would have to show disparate treatment. Once they have passed that threshold, they would have to show there is no rational basis for that distinction, that there was no rational basis for treating them differently than others who were similarly situated in all relevant respects. And so those are the basic elements of the Class of 1 claim. And as we explain in our briefs, the claim in this case was the court correctly granted the motion for summary judgment on both of them. Were there any of – any situations where there was a fire on this – on these premises? Was there a prior situation where there was a fire? I don't believe so, no. No. What the record showed is that when the property was assigned for inspection by the CCIT, there had been prior fire code violations, the history of criminal behavior and nuisance activity that the district court noted going back about 15 years, and suspected significant building code violations. And those were due mostly, I believe, to the inspector – I'm sorry, Officer Alt Myers testified that just sort of thing that made him suspect there were building code violations. And then, as I explained, our position is that the record shows that the property was assigned to the CCIT after the May 2007 follow-up inspection, which revealed another slew of fire code violations. But again, really, the bottom line of this case comes back to the lack of comparatives and to the fact that the plaintiffs did not show that they were, or at least did not give rise to a question of material fact as to whether they were treated differently than others who were similarly situated in all relevant respects. Moving on briefly to the common law negligence claim, as Your Honor pointed out, there is nothing in the record to give rise to an issue of material fact as to whether it was negligent to cut off power to both structures. As the district court pointed out, there's nothing contradictory in the declarations by the Myers saying these were separately metered. And the testimony by the electrician, the expert who testified in his professional opinion, it wasn't possible to separate the electrical systems. I would also like to point out that the record showed that the conditions that led to the power having to be shut off were things like the electrical system had been jury-rigged with wires that were impossible to trace. And so, again, there was no evidence that there was standing water in the basements where these wires were located. And so there was nothing to suggest also that it, even if it had been possible to separate the two buildings, that shutting off power to both buildings was not justified. But then, as we also point out in our brief, even if that threshold could be passed, the fact remains that there was no evidence of causation in this case. The roof collapsed about six months after the power was shut off, and Plaintiff Michael Wright testified in a deposition, in fact, very specifically, as the district court noted, stated that the pump was, quote, not hardwired, that it was not plugged in to engage automatically, that he had never needed to pump water off the roof, that, in fact, he had only tested the pump, quote, a couple of times over the last 10 to 12 years and did not know if it even still worked, that after the power was cut off, he checked his roof at least monthly to make sure that the water was still running, that the water was being evacuated, that if he had seen water accumulate, he would not have used the pump, he would have just called a roto-rooter-type service. And as the district court noted, that really was dispositive of the causation issue. So again, to sum up, on the Class of 1 claim, plaintiffs did not point to any evidence that they were treated differently than others who were similarly situated in all relevant respects. And on their negligence claim, plaintiffs did not point to any evidence that defendants were negligent in shutting off the power to the building or that doing so caused the collapse of the roof of that building six months later. And for those reasons, this Court should affirm the judgment of the district court. All right. Did you make an offer of proof on this Barrett Creek? Did you bring any evidence of other buildings that were similarly? We did not bring evidence of other buildings. We believe by the holdings of this Court that that's not required. We believe that the concession, and I can address that issue because I heard the argument that there isn't any evidence of concessions. Well, on a summary judgment, if you usually have a material question of fact set up in the pleadings, and then you go into discovery and you find out what the evidence is going to be, and you have a pre-trial conference and you make offers of proof and so on, I just wondered if you were — if you had evidence that this was a — this is singled out for special treatment for an improper purpose. You'd have to have some evidence of that, wouldn't you? Well, first of all, we didn't have the pre-trial conferences. It was a summary judgment, of course. And as far as the evidence of being singled out, we have admissions from the city that they did single them out and treated them differently. And I — Well, I don't know whether they admitted that. They admitted that they had a special list of premises that this task force was looking at. Well, beyond that, they admitted, for instance, in the record 74 is where they admitted that the inspection was excessive for this — for the bookstore. On page — Botkin, on page 87, he said that no fire — no code violations whatsoever were discussed before the 11 inspection, and no reason was given for the inspection, and that there was no open cases. He also — McDonald, another individual with the Bureau of Services, he stated that he was told to do a thorough inspection and that the treatment was not customary. That is the treatment of the bookstore. So we have littered throughout this admissions from city officials that they were treating my client differently. We also have the Commissioner, Randy Leonard himself, who stated that — Well, it said not customary. Well, if you look at — and I think you can fall back on, as I mentioned before, with the Bureau of Services, here's how they do inspections. If there's a permit or a violation, there were none. They did two full-blown inspections. How about the Fire Bureau? How do they do inspections? If it's a re-inspection, they do re-inspections every two years. This was done 18 months later. And on their own Fire Bureau report, it says special inspection. And in his deposition, Mr. Alderman said, this was a special inspection. I've never, ever done a special inspection with three people, especially someone from the Bureau of Services. Well, they set — they set up — they set up this task force to go out and conduct these special inspections on properties where they felt it was warranted. And I think that's the exact issue. And I think the one point of when was my client targeted, they're saying there's no evidence, not true. Page 109, page 130, Officer Myers admitted that he spoke with Botkin prior to May 31, 2007. Myers is from the police department. Botkin is the other fellow member on the task force from the Bureau of Services. The fact that they did a three-person inspection to re-inspect a label on a fire extinguisher and a burned-out light bulb, that alone is sufficient facts construed in our favor to show that they were placed on this supposed list. A couple other things, I think it's also important to note that the 30 code violations they found were remedied, that their own records paged. Well, didn't they have evidence that criminal activity was going on? And they also admitted that these — this evidence was from their self-generated reports that Mr. Myers self-generated. We also have evidence in the record that they waited for the criminals, known criminals, to enter the premises, and then they arrested them. So there's a fun — What's wrong? What's wrong with that? Well, what's wrong with that is it just shows, once again, the animosity between Officer Myers and the intent. The problem we have here is we have a rogue task force that has no — they say there's no criteria. They don't have any criteria. There's no objectivity. Everyone's admitted that there was no statistics done to determine which property to go after. Didn't they look at it? Weren't there some admissions made by your clients or their employees that people were coming in there and shooting up, and there were needles or — There was also admissions from the city that my clients had nothing to do with the criminal activity, that none of them were responsible for it. Well — This is in Old Town. Yeah. But, I mean, but it was a place where it was being conducted. But that doesn't justify — They knew what was going on. That doesn't justify having a heightened inspection for Bureau services and for fire inspection. Well, you know, people that are shooting up, they can use matches to heat the liquid up or whatever they do. Through — if I could just address really quick — You have — Yeah. I mean, upon the roof, did they go up and inspect that roof periodically, check the leaves and the down drain? Is there any evidence on that? There was testimony, absolutely. How often did they do it? How often did he inspect it? Yeah. I believe it was every couple years. I can't be certain what it says in the record. Well, you got buildings. You don't just wait every couple years. You get a lot of storms over here. Leaves get on — leaves get on the roofs. Well, when they did the full-blown inspection of the roof, I think what's important to note there is they didn't find anything wrong with the roof that ended up collapsing. They found something wrong with the other roof. So — I'm not talking about the roof. I'm talking about the — the drains and the accumulation of water. Well, a couple other points I want to address really quick is that an important error that we feel that the district court made was they said that there's no evidence in the record that Mr. Myers had decision-making authority for it. If page 68 is that evidence, that's where Alderman said that Myers had final authority, final say on which buildings, what property to go after. Another thing real quick, towery was mentioned, court recalls. That has to do with the protocol for execution. Yes, that can be clearly distinguished, as can the Inquis case, because that's an employment matter. Yes, those — those kinds of situations involve discretion. There's a body of case law involving code enforcement completely different. And finally — Kennedy. Let's end your time, sir.  I appreciate that. Thank you. Thank you. All right. And that concludes this session. And the court will recess until I believe it's 1230 this afternoon on another matter. Not this same panel, but another panel. All rise.
judges: Goodwin, Pregerson, Christen